LAW OFFICES OF

# SCOTT B. TULMAN & ASSOCIATES, PLLC

THE HELMSLEY BUILDING
230 PARK AVENUE, 18th Floor
NEW YORK, NEW YORK 10169
(212) 867-3600

stulman@tulmanlaw.com
WWW.TULMANLAW.COM

April 28, 2026

Honorable Diane Gujarati
United States District Court Judge
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

  Re: <u>United States v. Eric Zhu</u>
    25 CR 340 (DG)

Dear Judge Gujarati:

Defendant Eric Zhu ("Eric" or "Zhu") respectfully submits this sentencing memorandum, along with the attached exhibits, in advance of Eric Zhu's sentencing. Sentencing presently is scheduled for May 19, 2026, at 10:00 a.m.

In Section I of this memorandum (pp. 2-,5) we provide the Court with the Defense Sentencing Recommendation and our Justification for it. In Section II (pp. 5-7), we address the Legal Principles Governing Sentencing, including the Advisory Guidelines Calculations and the Guidelines Range discussed in Section III (pp. 7-12). In Section IV (pp. 12-29), we turn to the §3553(a) analysis before concluding in Section V (p.30).

We submit with this sentencing memorandum the following exhibits:

A. Mitigation Report of Muriel Bell, LMSW;
B. Letters from Family, Neighbors and Friends in Support of Leniency;
C. Eric Zhu's Letter to the Court;
D. April 2013 NY Times Article describing endemic relevant offense conduct; and,
E. Sentencing Commission Sentencing Statistics, 2024.

For all of the reasons provided to the Court in this sentencing proceeding, we recommend that Eric Zhu be sentenced to a term of twelve months' home incarceration as a special condition of a five-year term of probation, along with restitution, forfeiture, community service, medical and substance abuse treatment, and all other conditions recommended by Probation in the PSR.

## I.      Defense Sentencing Recommendation and Justification


Eric Zhu, now 28 years old[1], is a soft-spoken, industrious, non-violent, zero-point first offender, whose considerable talents and abilities, unfortunately, were put to bad use by familial pressures imposed on him as a youngster to help his family operate and save the failing social adult day care center ("SADC") his father had opened.  Eric did not want to enter the healthcare industry; he wanted to stay in school, but filial piety required him to assist his non-English-speaking, illiterate father in much the same way he had assisted his parents as a child in what was ultimately a failed Chinese restaurant. [2]

Eric, a first-generation American and the eldest son of poverty-stricken Fujianese immigrants, had to disrupt his life in High School and ultimately leave college in his first year to spend his time learning about the health care insurance industry and the unlawful endemic practices then being relied upon by SADC centers to enroll and maintain Medicaid recipients at these facilities.  The SADC centers could, in turn, bill Managed Long Term Care ("MLTC") providers who were compensated by Medicaid based on the number of their qualified insureds enrolled in and receiving SADC services.   Both the SADC and the MLTC had financial incentives to maintain high enrollments.

What Eric learned very quickly with his High School education was that an SADC that did not pay Medicaid recipients incentives, or what the law calls kickbacks, would be driven out of business by competing SADC Centers prepared to pay those incentives.  See e.g., *United States v. She Hong Tom Yip, et al,* 24 CR 293 (NRM)(pending EDNY matter involving competing SADC). This unlawful but widespread practice of paying seniors to attend SADC was being reported by the New York Times as early as 2013.  See: **Exhibit D**, Bernstein, Nina, "*State Suspends Enrollment in Adult Care Plan Amid Fraud Concerns,*" NY Times, April 25, 2013, www.nytimes.com/2013/04/26/nyregion/new-york-suspends-enrollment-in-long-term-care-plan.html.  In 2013, Eric Zhu was 16 years old.

 The Government fully recognizes this unfortunate economic reality in the health care marketplace. See, *United States v. Hua Huang,* 23 CR 234 (ARR), ECF Doc. No. 45 *(*Gov't Sentencing Memorandum – Defendant Huang engaged in the "brazen payment of kickbacks and bribes in the form of supermarket gift certificates and cash, a practice that is endemic in Brooklyn and Queens pharmacies."  This conduct "drives legitimate health care providers from the marketplace." *Id.*

---

[1]   Eric will turn 29 On May 30, 2026.  He was born in 1997

[2] Eric's poverty-stricken and difficult childhood, marked by his father's insistence that Eric assist him at work, is discussed in the PSR ¶44, the Mitigation Report prepared by Muriel Bell, LMSW (**Exhibit A**), and the recollections from those who know Zhu best, like his sister. (**Exhibit B**).

Although Eric, working with his older cousin,[3] soon learned that paying kickbacks to senior-citizen Medicaid recipients was unlawful, he also learned that it was endemic in many New York City immigrant communities. As a member of an immigrant community himself, Eric Zhu knew that many of these infirm, senior-citizen Medicaid recipients were as poverty-stricken as his family once was, and the seniors were relying on the cash payments that the SADCs gave them each month to make ends meet. The cash payments were, in a very real sense, helping them survive, whether or not they participated in SADC activities.

Eric's grandmother was the legal owner of Prime Life Adult Day Care ("Prime Life"), an SADC center that opened in Brooklyn in April 2020, but Eric's father was the impetus behind the operation. Prime Life had a subcontract from an MLTC provider to provide SADC services to pre-approved Medicaid recipients. From its inception in April 2020, Prime Life competed with other SACD centers in Brooklyn by engaging in the widespread practice of paying cash kickbacks to qualified and pre-approved Medicaid recipients to enroll and maintain their enrollment at Prime Life.

Over the course of five years, Medicaid through the MLTC paid Prime Life a little over $3 million for services purportedly provided to its senior clients. The "services" to the seniors included unlawful enrollment fees and monthly cash payments totaling nearly half of the funds received by Prime Life, as well as SADC services if the senior wanted them.

While irrelevant to the advisory guidelines calculations, but relevant to the issue of Eric Zhu's punishment, Prime Life's actual profit from the offense and Eric Zhu's personal gain was *de minimis* because a significant part of the remaining funds was used to pay what would otherwise have been lawful expenses associated with the operation of the licensed SADC, such as rent, staff, food and transportation expenses. Prime Life was always open for inspection and audit by the MLTC provider. Indeed, Prime Life routinely passed MLTC audits because contractually appropriate SADC services were always available to seniors who wished to avail themselves of them.

Eric Zhu was Prime Life's manager and Prime's beneficial owner with ties to his grandmother and father. Eric's duties at Prime included supervising the programming staff, ensuring healthy meals were prepared by appropriately licensed staff, and arranging transportation for seniors wishing to participate in SADC – all perfectly proper responsibilities. Unfortunately, Eric's duties also included billing and bill payments, which included unlawful monthly cash payments to seniors, the preparation of false attendance records to support the billing, and the money laundering necessary to obtain cash from Medicaid proceeds to pay the cash benefits to the Medicaid recipients.

Law enforcement began its investigation of Prime Life's unlawful practices in July 2024. Ten months later, in May 2025, a confidential informant and confidential witnesses posing as

---

[3] See Exhibit A

qualified Medicaid recipients infiltrated Prime Life and recorded on video and audio Eric Zhu negotiating and ultimately paying kickbacks to enroll the elderly recipients.

In late August 2025, Eric was arrested at JFK International Airport before leaving for a planned family vacation. Eric Zhu was immediately prepared to accept responsibility for his conduct. He knew what he was doing, knew it was wrong, and he now understands that under the law, he is not entitled to credit for legitimate services Prime Life provided because Prime Life was permeated with fraud. Eric knows that when a search warrant was executed at the Prime Life Senior Center on August 27, 2025, multiple envelopes containing cash were recovered with the Medicaid recipients' names written on them. Those envelopes were destined for Medicaid recipients enrolled at Prime Life, other than informants. These elderly, infirm seniors were the primary beneficiaries of and participants with Eric Zhu in the unlawful scheme to defraud Medicaid. (PSR ¶20).

In October 2025, Zhu pled guilty to a single count information charging him with conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347, 1349. He has fully accepted responsibility for his offense conduct at Prime Life, will be barred from ever again being a Medicaid provider, and will now move on from the SADC industry that he was compelled to enter at his father's direction and insistence.

The loss in this case, approximately $3 Million, while significant, pales in comparison to those similarly situated to, indeed more culpable than, Eric Zhu, who caused far greater losses to Medicaid or Medicare, and who received sentences well outside and below the advisory guideline range. See, e g. *United States v. Feng Jiang*, 24 CR 264 (ARR) (EDNY)(Fifteen months with a $24 Million loss and restitution).

As a punishment, Eric Zhu has agreed to forfeit to the Government a significant financial penalty of not less than $1,500,000.00, and Eric will personally return to Medicaid the over $3 Million in gross proceeds that Prime Life received from the MLTC during the five years Prime Life operated. Again, most of these proceeds went to other participants in the offense, i.e. the senior citizens, or expenses associated with the SADC. Accordingly, these penalties are painful and punitive and substantially greater than a "small fine" for this white-collar defendant. See: Section IV(C), *infra* at p.19 discussing general deterrence. A powerful message has been sent to both Eric Zhu and the public at large – health care fraud will be severely punished.

Probation has found, and the Mitigation Report supports the finding that Eric has family ties and responsibilities that support a significant variance, given that he is the primary provider and caretaker for his wife, ill with a thyroid condition, and his two young children. It was well settled in this Circuit even prior to Booker that, "(a)mong the permissible justifications for downward departure . . . is the need, given appropriate circumstances, to reduce the destructive effects that incarceration of a defendant may have on innocent third parties." *United States v. Milikowsky*, 65 F.3d 4, 8 (2d Cir. 1995). Here, Eric's family circumstances and his demonstrated potential for rehabilitation must be given paramount consideration, along with an appropriate punishment to serve the goal of general deterrence.

Based on the information available to the Court, Eric Zhu poses no significant risk of recidivism or danger to the community. His post-arrest rehabilitation evidences the change in Eric that comes with the recognition that there must be a break with the negative influences that led him to become involved in healthcare fraud in the first place.

An individualized sentence for Eric Zhu sufficient to punish him, deter others, and permit his continued rehabilitation would involve harsh economic sanctions and a significant term of home incarceration as a special condition of a sentence to probation. Here, the balancing of the §3553(a) sentencing factors call for a non-custodial sentence because the stigma and impact of a felony conviction, coupled with a significant term of home incarceration and community service, and the financial obligations that must and will be paid, justly punish Eric Zhu for his offense conduct and will serve to deter others who think that paying kickbacks will not be harshly punished. The competing purposes of sentencing do not require a custodial sentence in this case. There is no question that Eric Zhu has learned his lesson.

Accordingly, we respectfully recommend that Eric Zhu be sentenced to five years' probation with a significant term of home incarceration, coupled with community service, together with restitution in the amount of $3,169,355 and forfeiture not less than $1.5 million, severe economic punishments, as agreed to in the Plea Agreement with the Government.

## II.      Legal Principles Governing Sentencing

We presume the Court's familiarity with the legal principles governing sentencing and are confident the Court will make an individualized assessment of Zhu, give the advisory guidelines and policy statements appropriate consideration, and adhere to the "overarching" directive of Title 18 U.S.C. Section 3553(a) that the Court consider all of the 3553(a) factors and impose a sentence not greater than necessary to accomplish the goals of sentencing. See *Gall v. United States*, 552 U.S. 3 (2007); *Kimbrough v. United States*, 128 S.Ct. 558 (2007).

In *Gall*, the Supreme Court provided considerable guidance to District Judges on the unenviable task of imposing sentences. In the district court, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" in deciding what sentence to impose. 128 S.Ct. at 596. However, a District Judge "may not presume that the Guidelines range is reasonable," but must "make an individualized assessment on the facts presented." Id. at 596-97 (emphasis added).

Quoting from the Supreme Court's earlier opinion in *Koon v. United States*, 518 U.S. 81, 113 (1996), Justice Stevens in *Gall* wrote that "in the federal judicial tradition[,] ... the sentencing judge [is] to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." 128 S.Ct. at 598.

When balancing the § 3553(a) factors, a judge may determine that, "in the particular case, a within Guidelines sentence is `greater than necessary' to serve the objectives of sentencing." *Kimbrough*, 128 S.Ct. at 564. Accordingly, when appropriate, a District Judge may vary from the applicable guideline range "based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 128 S.Ct. at 570.

As the Second Circuit has stated:

> "[B]ased on the unique facts of a particular case, austere adherence to the averages and generalities of the Guidelines can be unjust and contrary to reason.... No chart of numbers will ever fully contemplate, quantify and cipher the endless variations of the human experience. While it might provide a normalizing force in sentencing, we cannot, with a system of points and categories, reduce justice to a universal formula. Ultimately, in the federal sentencing scheme, it is the sentencing judge who plays the primary role in determining an appropriate sentence. The appellate court's role is a secondary one and the determination of the district court is entitled to great weight under a "deferential abuse of discretion standard." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008).

The §3553(a) factors are as follows:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed, to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense;

(3) the need to afford adequate deterrence to criminal conduct;

(4) the need, if any, to protect the public from further crimes of the defendant;

(5) the need provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner;.

(6) the kinds of sentences available;

(7) the applicable Guidelines range;

(8) any pertinent policy statement in the Guidelines;.

    (9)    the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and,

    (10)    the need to provide restitution to any victims of the offense, here the sole victim being the New York State Department of Health, Medicaid Financial Management. (PSR ¶ 21).

The "overarching" command of § 3553(a) is the "Parsimony Clause", which "instruct[s] district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." Kimbrough, 128 S.Ct. at 563 (quoting Gall, 128 S.Ct. at 600).

III. **The Advisory Guidelines Calculations and Guideline Range Should Be Given Little Weight as a Sentencing Factor in this Case**

We begin, as the Supreme Court instructs, with a calculation of the applicable Sentencing Guidelines range based on the applicable guidelines provisions. This is the "starting point" for the sentencing determination.

A. **The Advisory Guideline Calculations and Guideline Range**

The Department of Probation's guidelines calculations were based on the 2025 edition of the Guidelines Manual. Probation's calculations are consistent with the Parties Guideline estimates as set forth in paragraph 2 of the Parties Plea Agreement. (PSR ¶24):

    1.    **Adjusted Offense Level:**

| | |
|---|---|
| Base offense Level (§2B1.1(a)(2)) | 6 |
| Plus: Loss Amount in excess of $1,500,000 but not more than $7,000,000. (§2B1.1(b)(1)(I) | +16 |
| Plus: Health Care Fraud Offense greater than $1 million (§2B1(b)(7))(A) | + 2 |
| Plus: Organizer or leader of criminal activity Involving five or more participants (§3B1.1(a)) | + 4 |
| | 28 |
| Less: Timely Acceptance of Responsibility | -3 |
| Adjusted Offense Level | 25 |

2.      **Criminal History Category**:  Eric has no arrests, juvenile adjudications, or adult convictions apart from this pending matter.  (PSR ¶¶ 35, 36, 40).  His criminal history score therefore is 0, and he is in CHC I.   Nevertheless, Eric is ineligible for the §4C1.1(a) 2 point downward adjustment because he was the beneficial owner and manager of Prime Life and personally enrolled and paid kickbacks to more than five Medicaid recipients.  (PSR ¶ 28).  Thus, while Eric is indisputably a first-time, non-violent felony offender – a circumstance certainly warranting consideration as a §3553(a) factor – he cannot receive the benefit of this mitigating guideline adjustment.  Although the advisory Guidelines ostensibly take Zhu's status as a first time offender into account, the Supreme Court has affirmed sentences where the District Court expressly and specifically relied upon the lack of a prior serious criminal history to justify a non-guidelines sentence.  See, Gall, 128 S.Ct. at 601, Kimbrough, 128 S.C.t at 575-576.

3.      **Sentencing Range:**  The Department of Probation concluded that the advisory guideline range was between 57 to 71 months incarceration.

4.      **Downward Departures**:  Probation found no basis for a downward departure and pursuant to our Plea Agreement we seek no downward departures from the advisory guidelines.

5.      **Probation Recommendation**: The PSR recommends a downward variance from 57 months to 42 months, to be followed by a two-year period of supervised release.  Probation's justification for this downward variance was based on many factors including Eric being only 22 years old and subject to familial influences at the time his offense began, Eric's extraordinary family ties and responsibilities given the upending and uprooting financial struggles his wife and two children will face if he is incarcerated, and Eric's status as a zero-point offender posing little risk of recidivism.  (PSR Recommendation, p3).

**B.      The Guidelines Should Be Given Little Weight in the Sentencing Determination**

Pursuant to his plea agreement, Eric stipulated to the Government's guideline estimates but the plea agreement does not prevent Mr. Zhu from seeking variances from the stipulated guideline range based on factors set forth in 18 U.S.C. §3553(a), which include disagreements with the weight the guideline calculations should be given.

We respectfully submit that Probation's recommended downward variance does not go far enough because it places undue weight on the advisory guidelines' adjusted offense level as a "starting point" for its sentencing analysis.

For the reasons set forth below, the guidelines range should be given little consideration as the "starting point" in this case because fundamental defects in the advisory guidelines as applied in this case make it plain the guideline range does not yield a reasonable, fair or just

individualized sentence for Mr. Zhu in view of the ¶3553(a) factors and the kinds of sentences available including probation with a significant term of home confinement.[4]

.     1.     **The "Loss" Enhancement in Fraud Cases**

The advisory guidelines calling for draconian sentences based primarily on "loss" calculations in fraud cases have, for many years, been the subject of criticism by both the judiciary and respected legal commentators. Sentencing Judges and Appellate Judges reviewing sentences have long recognized that even an accurate calculation of loss as defined in the advisory guidelines may result in a sentencing range wholly divorced from the purposes set forth in §3553(a)(2).

For example, in *United States v. Algahaim*, 842 F.3d 796, 800-801 (2d Cir. 2016), the Second Circuit recognized that the §2B1.1 loss tables were not developed by an empirical analysis of past sentencing practices and that this fundamental flaw was "a circumstance that a sentencing court is entitled to consider" when determining the weight to be given this enhancement in the sentencing determination. See also, *United States v. Corsey,* 723 F.3d 366 (2d Cir. 2013)(Underhill, J. concurring)(Loss enhancement guideline is "fundamentally flawed, especially as loss amounts climb."); *United States v. Gupta,* 904 F. Supp.2d 349 (SDNY 2012)("By making a Guidelines sentence turn on this single factor [loss or gain], the Sentencing Commission ignored [§3553(a)] and . .. effectively guaranteed that many such sentences would be irrational on their face."

This case illustrates the fundamental flaw in the loss guidelines. Here, the 16-point increase in Eric's offense level was based on the gross amounts paid by the MLTC to Prime Life during the five-year period between 2020 and 2025, without considering the profit that Prime Life realized, or the fact that the gross amounts included sums spent by Prime Life for otherwise compensable purposes, but for the unlawful conduct taking place at Prime Life.

It is undisputed that Prime Life's bank records would establish that between 2020 and 2025, Prime Life received $3,169,335 into its bank account from the MLTC provider. (PSR ¶17). Those same records, however, would also establish that approximately one-half of those funds, $1,500,000, was used to write checks from Prime Life's operating account (not several

---

[4]  Notably, the U.S. Sentencing Commission has found that "[t]here is no correlation between recidivism and guideline' offense level….While surprising at first glance, this finding should be expected. The guidelines' offense level was not intended or designed to predict recidivism." U.S. Sent. Comm., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guideline,* at 15 (May 2004).

bank accounts) to several entities that would provide Eric with the cash for monthly payments to Medicaid recipients.[5]  (PSR ¶ 15).

The remaining funds received from Medicaid recipients were used largely to pay what would otherwise be legitimate business expenses associated with the running of the SADC center, such as rent actually paid for the space in which Medicaid recipients congregated and socialized, salaries paid to trained and licensed SADC staff to run programs and serve healthy, approved meals, and sums paid for transportation services to enable the Medicaid recipients to attend and receive services at the SADC center. (PSR ¶9).[6]

Ordinarily, the Sentencing Guidelines require that loss calculations in healthcare fraud cases be offset by the fair market value of legitimate services rendered before the offense was detected.  This requirement arises from Application Note 3(E)(i) to § 2B1.1 which states that the loss amount should exclude the value of legitimate services provided to recipients if the defendant can prove that the services would have been paid for but for fraud.  See, *United States v. Hamilton,* 37 F.4th 246 (5th Cir. 2022).  Prime Life's bank records would show costs and expenses legitimately incurred by Prime Life and Eric for the provision of legitimate SADC services, such as rent, transportation, programs, and meals.

Notwithstanding the demonstrable, legitimate expenses incurred by Prime Life for services provided to the Senior Citizens (in addition to their monthly cash payment), Eric Zhu has agreed in his plea agreement to be held responsible both for guidelines' purposes and in restitution for every penny Prime Life received from NY Medicaid.  In addition to returning to Medicaid in restitution all sums Prime Life received from Medicaid, Eric has also agreed to forfeit as a significant financial penalty not less than  $1.5 Million, which is far in excess of any gain Eric personally realized from Prime Life.  (PSR ¶ 21).

We seek leniency for Eric Zhu because, unlike others, he has agreed by his conduct, not just his words, to fully accept responsibility for the offense conduct at Prime Life, and that acceptance includes Eric Zhu paying back to Medicaid the entire amount Prime Life received from the Program, as well as a significant financial penalty by way of forfeiture.

---

[5]  The PSR states that several bank accounts were used to write checks, but it was in fact only the Prime Life Operating Account used for this purpose.

[6]  MLTC auditors were routinely at Prime Life not only reviewing attendance records but observing the attending seniors engaged in social activities and programs while the kitchen staff was at work.  Had Prime Life been a shell not providing services to its Medicaid recipients, it would not have escaped the attention of the MLTC auditors.  That said, Eric Zhu acknowledges that all the seniors showed up for SADC when it was time for them to receive a cash payment.

2.          **The Four-Point Role Adjustment**

U.S.S.G. §3B1.1(a) provides for a four-level enhancement only "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Application Note 4 lists the "[f]actors the court should consider" in evaluating a defendant's role in the offense, including "the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. §3B1.1 cmt. n.4. A "participant," meanwhile, is "a person who is criminally responsible for the commission of the offense but need not have been convicted." U.S.S.G. §3B1.1 cmt. n.1.

"In enhancing a defendant's sentence based on his role in the offense, a district court must make specific factual findings as to that role" but the district court may satisfy its "obligation to make the requisite specific factual findings" by explicitly adopting in open court "the factual findings set forth in the presentence report [('PSR')]." *United States v. Carter,* 489 F.3d 528, 539, cited in *United States v. James,* 151 F.4th 28, at 44-45 (2d Cir. 2025).

At bar, Eric admitted in his guilty plea that he paid and supervised the payment of kickbacks in cash to senior citizen Medicaid recipients to induce them to become and remain clients of Prime Life.  Further, Eric does not dispute that he was a beneficial owner and manager of Prime Life and that he actively recruited senior citizens to enroll at Prime Life with the promise of cash payments.  The Government accurately informed Probation that more than five Medicaid recipients were participants in the Prime Life kickback scheme with Zhu, and this is duly reported in the PSR  (PSR ¶ 28).  Apart from the seniors, others, such as Eric's grandmother and staff members, were involved in the scheme with Eric. Accordingly, there is a factual basis for the four-point enhancement to which Zhu stipulated.

In determining the weight to be given to this role adjustment, however, the Court should consider that the majority of Eric's "partners in crime" were not drug dealers, gangsters, thieves, or conmen.  They were poverty-stricken elderly people in failing health who relied upon and used the cash kickbacks he provided them as a *de facto* government subsidy to meet basic needs, such as paying rent, medical, or utility bills.  These Medicaid recipients were paid whether they came to the SADC center or not, but they were always welcome to come for the services the SADC offered pursuant to its contract with the MLTC, including meals and transportation.  The fact that many senior citizens elected not to avail themselves of these services was something that was simply beyond Eric Zhu's control.

Eric Zhu's agreement to a four-point role enhancement reflects his candid and extraordinary acceptance of responsibility for his misconduct. Organizers and leaders of complex, large-scale health care fraud schemes typically negotiate successfully for lesser-role

adjustments, even though they are, in fact, far more culpable than Eric Zhu.  See, e.g., *United States v. Kim*, 23 Cr. 191 (DG)(Organizer and leader receives 2 point enhancement).

From the outset, Eric Zhu, through counsel, agreed to a 4 point role enhancement in the hope that the Court when determining a reasonable, individualized sentence in this case will ultimately focus not on the generalities of the guidelines but on Eric's actual offense conduct viewed in context, the actual gain he received from his offense conduct, the actual familial pressures placed upon him his entire life to engage in this unlawful conduct, and his actual post-arrest rehabilitative conduct. Accordingly, the four-point role enhancement should be given little weight in the sentencing determination, even though it greatly impacts the advisory offense level.

IV.    **§3553(a) Analysis**

   A.    **Nature and Circumstances of the Offense and the History and Characteristics of the defendant**

      1.    **Offense Conduct**

Section 3553 (a)(6) instructs courts to consider "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1).

The nature and circumstances of Eric Zhu's offense weigh in favor of a sentence with a lengthy term of home confinement, as part of a sentence of probation. Eric Zhu has fully acknowledged the gravity of his actions and the harm he caused Medicaid.  He respectfully seeks mercy because his conduct was not motivated by greed or other nefarious purposes but rather because he believed himself bound by his father's bidding and initially believed, naively perhaps, that he was helping the seniors, not hurting the health care system.

Elderly Medicaid Recipients in immigrant communities lead difficult lives marked by financial hardship.  They lead frugal lives, surviving on government assistance and limited funds to meet basic financial obligations such as medical services, rent and electricity.  The Federal Government provides funding to the States to assist the States in providing medical and other assistance to elderly Medicaid Recipients.

Between April 2020 and August 2025, Prime Life was an Adult Daycare Center approved by an MLTC to provide SADC for qualified Medicaid recipients and to bill the MLTC for those services.  (PSR ¶ 16) During this time, Prime Life billed NY Medicaid through the MLTC and was paid $3,169,355 for SADC services.  (PSR ¶17)

The MLTC is a private entity approved by the New York State Department of Health (DOH) to provide managed long-term care for needy Medicaid recipients, which care includes SADC and/or home care services.  (PSR ¶8).  The MLTC was and is responsible for qualifying and approving those eligible to receive SADC.  (PSR ¶ 11). Prime Life played no role in this

approval process.  The MLTC is authorized to bill the Medicaid Program based on the number of qualified Medicaid recipients for whom it and its subcontractors provide services. (PSR ¶ 8, 11)

Eric Zhu, the "program director" of Prime Life and the point of contact for insurance claims was 22 years old when Prime Life obtained its subcontract as an SADC provider for the MLTC..  (PSR ¶¶ 13, 16).  Eric's grandmother was recruited by Eric's father to serve as  Prime Life's actual owner. (PSR ¶ 18).[7]

Unbeknownst to  NY Medicaid, the sole victim in this case, Prime Life, through Eric Zhu,  offered to pay and paid cash kickbacks to pre-approved and presumably qualified Medicaid recipients, in violation of the anti-kickback statutes, Medicaid's rules and regulations, and the MLTC sub-contract, to induce these pre-approved Medicaid recipients to enroll or maintain their enrollment at Prime Life (PSR ¶¶ 14, 16, 21).

Eric Zhu compounded this unlawful conduct by conditioning the cash payments on the Medicaid recipient's signing monthly sign-in sheets required by the MLTC subcontract to document the Medicaid Recipients attendance and participation in SADC, even if the Medicaid Recipient had elected to not come to the SADC Center.  By obtaining these sign-in sheets from the Medicaid recipients, Prime Life could and did bill for services rendered, whether the Medicaid recipients availed themselves of the SADC services available to them or not.  This generated income for Prime Life that it used to pay the Medicaid recipients the following month.  For the Medicaid recipient it was a win-win – a monthly cash payment and SADC at the SADC center if they wished to attend.   (PSR ¶¶ 10, 16)

The investigation of Prime Life began in July 2024 and resulted in the infiltration of Prime Life in May 2025 by a Confidential Informant and more than five purported qualified Medicaid recipients of Pakistani descent who were paid cash by Zhu to enroll at Prime Life.  Thereafter, to collect a monthly cash payment, the informant Medicaid recipients were required to appear at the end of the month to sign an attendance record for past attendance, whether they attended or not.  (PSR ¶ 14, See, Redacted Complaint – ECF Doc. No.4).

Although Prime Life was infiltrated only months prior to Eric Zhu's arrest in August 2025, the truth is, as noted earlier, that the payment of kickbacks and the fraudulent billing for services regardless of the Medicaid recipient's actual attendance were business practices that permeated Prime Life's operations from the inception of its sub-contact with the MLTC.  The unfortunate sad reality is that a Medicaid recipient can go to any one of a number of approved SADC providers willing to pay and overlook the Medicaid recipient's failure to attend SADC services for the requisite number of days required by the subcontract.  The SADC provider who refuses to make cash payments will, in short order, have no Medicaid recipients .

---

[7]  The PSR inaccurately states that Eric's father owned Prime Life; in fact it was his grandmother.

### 2. Eric Zhu's History and Characteristics

Section 3553 (a)(6) instructs courts to consider "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

### (a) Mitigation Report of Muriel Bell, LCSW

Eric's personal history, including the family pressures driving him into the SADC industry, was investigated by a mitigation specialist retained by the defense, Muriel Bell, LCSW. Her report, attached as Exhibit A reflects Ms. Bell's investigation and exploration of Eric's childhood and early adulthood.

Eric Zhu was 22 years old when his offense behavior with Prime Life began and he was arrested at age 28. Probation and Ms. Bell both highlight Eric's youthfulness at the time of the commission of this offense, the familial pressures that drove him to engage in the criminal conduct, and his potential for rehabilitation because of his age, important factors to be taken into consideration in the sentencing determination.

The PSR and Mitigation Report also underscore that Eric Zhu's family ties and responsibilities further support a significant variance based on his being the primary provider for his wife and two young children. It was well settled in this Circuit even prior to <u>Booker</u> that, "(a)mong the permissible justifications for downward departure . . . is the need, given appropriate circumstances, to reduce the destructive effects that incarceration of a defendant may have on innocent third parties." *United States v. Milikowsky*, 65 F.3d 4, 8 (2d Cir. 1995); *United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997)(affirming downward departure in drug case from 46-47 months to 8 days where Defendant showed he was a conscientious and caring father of two sons who would face severe financial hardship as a result of Defendant's incarceration). See, also. *United States v. Joyner*, 924 F.2d 454, 459-61 (2d Cir.1991) (departure affirmed where imprisonment of defendant "might well result in the destruction of an otherwise strong family unit"), *United States v. Alba,* 933 F.2d 1117 (2d Cir. 1991)(affirming downward departure on grounds that defendant worked two jobs to support two children, grandmother and disabled father who depended on defendant to transport him in a wheelchair), As the Second Circuit has observed, "the United States Sentencing Guidelines do not require a judge to leave compassion and common sense at the door to the courtroom," *United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992).

We do not seek a downward departure here, but a variance. See, e.g., *United States v. Hawkins*, 380 F.Supp.2d 143, 165 (E.D.N.Y.2005), aff'd, 228 Fed. App'x 107 (2d Cir.2007) (concluding that any incarceration "will in effect doom his.... Rehabilitation should not now be destroyed by wanton and unthinking application of mechanical rules for imprisonment.").

**(b)      The Letters of Support**

The PSR and Muriel Bell's report reciting the many positive character traits Eric possesses, including his devotion and loyalty to others, as well as the many challenges Eric has faced, including the negative familial forces driving him into the SADC, are reflected by the letters written by those who know Eric best.

Eric's sister, Judy Zhu, has written a heartfelt letter to Your Honor (attached hereto as Exhibit D) in which she explains, from her own perspective, the challenges that Eric at a young age faced as his parents steered him away from his college education and into the operation of their SADC business.   She writes:

> With our parents unfamiliar with the day-to-day operations, he took on immense responsibility. He taught himself compliance, taxes, and operational management— things I could not have imagined handling at that age.

> The SADC industry is often run by owner-operators around my parents' age who manage their own businesses without placing that burden on their children. In Eric's case, it was different. He was introduced to the field by our parents and was pushed into taking on a leadership role.

> Your Honor, I understand the seriousness of the charges my brother is facing. However, I respectfully ask for leniency in your consideration. In many families, parents serve as a source of protection and guidance. In our case, my parents involved Eric in a complex and challenging business environment at a young age. I do not believe they intended to place him in harm's way, but he ultimately bore the weight of those decisions. Eric should not be punished for striving to be a filial son, a responsible brother, and a provider for two children.

> I respectfully ask that you give him another chance—to allow him the opportunity to return to school and pursue a career he genuinely enjoys. He grew up quickly and carried responsibilities that many his age never experience.

Qi Chen, the president of the homeowner's association in the Queens community where Eric lives with his family has observed first-hand Eric's selfless and helpful nature.  In his letter to the Court attached hereto as Exhibit E, he describes what he has seen:

> "From the time I became president, I repeatedly encouraged Eric to join the HOA board due to his reliability and active involvement. He consistently declined, explaining that he prefers to contribute without a formal title, as he is mindful of not taking on

responsibilities he may not be able to fulfill to others' expectations. Despite that, he has consistently been one of the most active and dependable members of our community.

Our HOA regularly organizes events for residents, including Easter celebrations for children, Halloween gatherings, and Christmas events. While these are officially organized by board members, Eric is always present behind the scenes, helping to set up, coordinate, and ensure everything runs smoothly. He developed a natural rapport with the younger children in our community—likely helped by the fact that he is still in his early twenties-which makes him especially approachable and well liked by them, including my own children.

Beyond events, Eric contributes in practical ways that directly benefit our neighbors. I have personally seen him volunteer his time to maintain the community-pulling weeds, sweeping sidewalks, and shoveling snow. I have also heard from residents on Beach Front Road, where Eric lives, that during the recent blizzard he spent hours helping neighbors shovel snow, particularly assisting an elderly resident. Even after his own electric shovel broke, he continued by coordinating with another neighbor who had better equipment to ensure the job was completed.

Another example that stands out is when Eric suggested that the HOA place a portion of its funds into bank certificates of deposit to generate interest income. Over the past several years, this decision has resulted in approximately $130,000 in interest, benefiting roughly 270 homeowners by helping offset possible future increases in HOA dues. This was not something he was required to do-he was not a member of the finance committee.

What defines Eric, in my experience, is that he contributes, solves problems, and steps away without expecting credit. In many cases, the board receives acknowledgment for the outcomes that Eric played a meaningful role in achieving. He frequently uses phrases like "we did it" and "it was a team effort," consistently redirecting recognition to others."

Edward Cuccia, an immigration practitioner who also represents a significant number of organizations in and around the Chinatown neighborhood, has known Eric for many years. Like Mr. Chen, he has taken note of Eric's civic-minded nature. He writes (Exhibit F hereto):

"Eric Zhu has donated much time and resources for the benefit of the community. Eric Zhu and I have worked together on a number of charitable and community events including: community choral singing events and immigration "know your rights" workshops. I have found Eric Zhu to be a person of upstanding character and fitness. I have found Eric Zhu to be giving and kind and concerned about the community."

(c) **Eric Zhu's Letter**

Eric Zhu's letter to the Court (**Exhibit C**) is a heartfelt, honest accounting that makes clear that prison is not necessary to teach this young man a lesson.

Dear Judge Gujarati:

I write this letter with full awareness that I must be held responsible and account for the poor decisions I made in my life, the seriousness of my actions, and the harm I caused to the Medicaid system.

Nothing I say here is intended to excuse or justify my mistakes of the past. But, at the same time, I want you to understand that I was very young when I became involved in the adult day care business, and I did not understand the broader system I was operating in and that the way it operated was unlawful.

When I first learned about the insurance end of the adult day care business, I understood that the managed long-term care plans act ("MLTC") as intermediaries, receiving fixed monthly payments funded by Medicaid based on the large populations of patients they manage. The MLTC is interested in managing large patient populations because this increases its value. The MLTCs are routinely sold and absorbed by others, with the owners making exorbitant amounts of money. These are billionaires – not millionaires. While adult day care operators like I was have incentives to retain members, the incentives at the MLTC level operate on an entirely different scale, involving billions of dollars. SADC providers who fail to provide new enrollments or maintain enrollments can be terminated as sub-contractors and will be out of business.

Prime Life Adult Day Care LLC dealt with only one MLTC, and it was that MLTC, Centers Plan for Healthy Living, that enrolled patients and evaluated them through a process called CFEEC (CONFLICT FREE EVAULATION and ENROLLMENT CENTER)  Once screened and approved by the MLTC, the patient can be followed by assessments conducted by nurses working for managed long-term care plans. These determinations, including the determination whether adult care services were necessary were decisions I had nothing to do with. Once that determination is made, there is a pressure placed on the adult day care to increase and then maintain its enrollments, because of the fear of being terminated as a provider**.**

Apart from it being tacitly condoned in the healthcare industry, it was very easy for me to rationalize what I was doing to excuse my illegal conduct. Many of the individuals I worked with were elderly immigrants with zero English proficiency, living on fixed incomes that did not come close to covering the cost of housing in New York City. They relied entirely on their immediate community for communication, for

navigating basic services, and for day-to-day survival. Many had spent their lives working low paying or informal jobs, leaving them with little to no retirement income beyond minimal Social Security or SSI. For them, housing was not a policy issue, it was a constant fear. I saw people worried about how they would pay rent, where they would go if they could not, and how they would survive in a system they could not even fully understand.

This was not unfamiliar to me. I grew up in a two-bedroom, one bathroom, 650-square-foot apartment that was divided into multiple rooms to fit ten  people—my parents, siblings, grandparents, and extended relatives all under one roof. That level of overcrowding was my normal. Seeing similar conditions among the elderly people I worked with did not stand out to me as unusual—it felt like a continuation of what I had always known. – and I felt terrible about it.  Overcrowded tenement-style living is often spoken about as something from the past—something that belonged to another era. But for many of the elderly immigrants I worked with, it is a present reality. They are living in cramped, divided apartments, sharing limited space with multiple family members, trying to survive on fixed incomes that do not meet the cost of housing. For them, this is not the history of immigrant struggles in America —it is daily life. That reality shaped how I saw what I was doing at the time. The patients believed the incentives came from the government, and I believed I was helping people maintain some level of stability in a situation where they had very little control.

Despite this, I fully acknowledge that I should have exercised better judgment. I should have stepped back and questioned what I was involved in. I did not, and I take responsibility for that failure.

This process has forced me to look inward in a way I had not before. It is one thing to understand what happens around you, but something else to confront your own decisions within it. As it is often said, "knowing others is intelligence, knowing yourself is true wisdom." I have come to see clearly where I failed. At the time, I moved with what felt like the natural flow around me. Looking back, I see I failed to step outside of it and question where it was leading. Actions carry consequences beyond the moment, and that responsibility does not end with intention—it extends to outcome.  Failing to question an environment is itself a choice, and one I will not repeat.

I also ask the Court to consider the practical impact of incarceration in my case. Incarceration comes at a significant cost to taxpayers when I have already cost the taxpayers so much money.  If an important goal here is to protect taxpayers and have me make restitution, then I beg you to give me the opportunity to right my wrong instead of spending those resources to incarcerate me.   I am capable of working. I am capable of contributing. I am capable of making restitution. Incarceration would remove that ability

entirely while adding further cost to the same taxpayers I am expected to repay, making my imprisonment a zero-sum game.

I am facing a substantial financial penalty—$3.1 million in restitution which I express ACTUAL plans to repay and not less than $1.5 million in forfeiture.  I have tried, in my own way, to atone for my wrongdoing. This felony conviction will follow me for the rest of my life.  These are real punishments, but I am committed to meeting the challenges and rebuilding my life in a lawful and responsible way. I am a husband, and a father not just a son.   I now understand the responsibility that comes with my roles as a husband and a father to my two children requires that I never again put myself in a position where I am violating the law, regardless of who asks me to do it.

I respectfully ask the Court to consider the pressures placed on me at a young age to operate in a system created by others that seemed to condone, not condemn my conduct in paying cash kickbacks to increase enrollments, my immediate acceptance of responsibility coupled with my efforts to get out of adult day care business, my lack of prior criminal history, and my commitment to making restitution when determining an appropriate sentence.

Eric Zhu's statement should be given serious consideration in mitigation of his sentence because his words, his stated intentions, and his actions have been relied upon and trusted and appreciated by people of respect, including but not limited to the Honorable Lester Chang, NYS Assemblyman.  (Exhibit B).

> **B.**      **the need for the sentence imposed, to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense;**

The substantial restriction of liberty resulting from a probationary sentence with a special condition requiring a significant period of home confinement, community service, and appropriate treatment for marijuana abuse (see PSR recommended conditions) amply and justly punishes this 28-year-old first offender, reflects the seriousness of his offense, and promotes respect for the law.

The crime for which Eric has been convicted is not one for which Congress mandated that minimum prison sentences must be imposed. The U.S. Sentencing Commission has noted that "dwindling prison space should be reserved for the most serious and dangerous offenders, necessitating a reconsideration of alternative sanctions for first-time and nonviolent offenders." Alternative Sentencing in the Federal Criminal Justice System, U.S. Sentencing Commission, Jan. 2009, p.1.

A sentence of probation constitutes a significant punishment that certainly curtails Eric's liberties. *See, e.g., Gall v. United States,* 552 U.S.38, 48-49 (2007) (a sentence of probation

"substantially restrict[s] [one's] liberty"); *see also United States v. Knights,* 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that 'probationers' do not enjoy the absolute liberty to which every citizen is entitled'"); *United States v. Tolla*, 781 F.2d 29, 35 (2d Cir. 1986) ("Probation itself contains elements of punishment in the restraints imposed upon the freedom of the individual….").

Notably, the Sentencing Commission has recently underscored that probation is a punishment. in the recently enacted Amendment 236 to the guidelines, which took effect on November 1, 2025, making it clear that the Sentencing Commission views a sentence of probation as serving the sentencing goals of punishment and deterrence, as well as rehabilitation, unlike supervised release, which "fulfills rehabilitative ends, distinct from those served by incarceration."

## C.     The Need to Deter Others

As far as general deterrence is concerned, we submit that under the circumstances of this case, a non-custodial sentence would send a sufficient message to those who might themselves consider involvement in similar fraud offenses, white collar offenders, that it is not worth the risk of arrest, prosecution and potential incarceration if caught.

We appreciate that considerations of general deterrence arise where the punishment is no more than a small fine and little or no imprisonment. This can create an impression that these offenses are punishable "only by a small fine that can be written off as a cost of doing business."). S.Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259. But, this is plainly not a case involving just a "small fine.[8]" The restitution and forfeiture obligations Eric Zhu faces are exponentially greater than the maximum fine permitted by law in this case.

The notion that only a jail sentence sends a message of general deterrence is simply wrong. There is no empirical evidence to support the claim that prison sentences serve to deter crime more so than probationary sentences. Indeed, the available scholarship shows that a prison sentence does not necessarily lead to increased deterrence, regardless of the type of crime. *See,* e.g., Andrew von Hisch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Francis T. Cullen, et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity"); David Weisburg et al., *Specific Deterrence in a Sample of*

---

[8] We observe the maximum fine for this offense is $250,000. Probation does not recommend a fine, noting the amount of restitution that is payable.

*Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); Oliver Roeder, et al, *"What Caused the Crime Decline?,"* Brennan Center for Justice, 22-23 (Feb. 12, 2015); Gary Kleck and J.C. Barnes, 59 Crime & Delinquency 1006, 1031-33 (2013( "increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between punishment levels and perceptions of punishment levels appears to be weak to nonexistent.").

### D.    The Need, if any, to Protect the Public from Eric Zhu

Section 3553(a)(2)(C) instructs the Court to consider the need to protect the public from any future crimes the defendant might commit when determining an appropriate sentence.

The facts and circumstances in this case, including Zhu's extraordinary acceptance of responsibility and post-arrest rehabilitative efforts, make it plain there is no need for specific deterrence - there is no reason to believe that Zhu will ever again have a brush with the law or that he presents any danger to society.

Because this is Eric's first and only criminal conviction, there is every reason to believe that Eric poses far less of a threat of recidivism. Indeed, there is no empirical support for the contention that a jail term – as opposed to a probationary sentence – will have any discernible impact on Eric's risk of recidivism.

According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science,* 91 Prison J. 48S, 50S-51S (2011). Studies have also demonstrated that, except for the incapacitative effect of incarceration, there is little apparent correlation between recidivism and imprisonment. Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism Among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received prison time were re-arrested at similar rates over a four year time frame"); David Weisburd et al, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes,* 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment).; *see also* National Institute of Corrections*, Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016). In fact, there is compelling evidence that prison - by disrupting education and employment, reducing prospects for future employment, weakening family ties and exposing less serious offenders to older more serious offenders – leads to increased recidivism. *See Criminogenic Effects of Imprisonment: Evidence From State Panel Data* 1974-2002, Criminology and Public Policy 589 (2007).

Zhu's offenses were non-violent, and the economic harm caused to Medicaid by paying kickbacks to senior citizens is simply not on the same level as health care offense that not only cause economic harm but also potential physical or mental harm to patients.

**E.      The Need to Provide the Defendant with needed Rehabilitative Training or Treatment in the most Effective Manner;.**

Another factor required to be considered under 18 U.S.C. 3553(a)(2)(D) is the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In *United States v. Tapia*, 564 U.S. 319, 326-32 (2011), the Supreme Court observed that Congress directed courts "to recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation.  See also *United States v. James, supra.* at 43-44(A defendant's potential eligibility for, participation in, and successful completion of a prison-based treatment program is an impermissible factor that the district court could not consider as a basis for lengthening a sentence).

Here, Eric Zhu's medical needs (PSR¶ 49, 50), and his need for rehabilitative training to assist him in finding new employment and new opportunities, make the need for a probationary sentence particularly appropriate because Eric is clearly capable of rehabilitation.

**F.      Kinds of Sentences Available;**

Title 18 U.S.C. § 3553(a)(3) requires the Court to consider "the kinds of sentences available."  In its original mandate, Congress directed the Sentencing Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C.§ 994(j).

This was done with the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and non-serious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." See Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note).

Eric Zhu is eligible by statute for a sentence of one to five years' probation.[9]   As a special condition of probation, pursuant to 18 U.S.C. §3563(b)(11), the Court may require that Eric "remain at his place of residence during non-working hours and, if the court finds it appropriate, that compliance be monitored by telephonic or electronic signaling devices." In addition to full restitution, the sentence in this case may also include the punitive sanctions of forfeiture and a fine.

Fraud is a serious offense, and health care fraud is a serious type of fraud, as reflected in a two-point enhancement in the advisory guidelines for this type of fraud when the loss exceeds $1 Million.  §2B1(b)((7)(A).  Yet there obviously are some fraud offenses that are more serious than others, with the number and nature of the victims and the amount and impact of the loss being significant factors on how serious the offense is.  For example, a fraud scheme targeting many vulnerable victims that steals tens of millions of dollars from them and causes them financial ruin or physical harm would be among the more serious of frauds.  Yet, even in these most serious of fraud cases, there may be room for mercy.  See, e.g. *United States v. Jason Galanis, 2025 WL 1649682 (SDNY 6/11/2025)*(Investment adviser sentenced to 189 months incarceration with restitution and forfeiture order of $80,869,117.10 granted Executive Grant of Clemency on March 28, 2025).

Here, there was one victim, Medicaid, and it was not a vulnerable victim because the MLTC had full access to the SADC and its own insureds.  Further, the $3 Million loss to Medicaid here, while significant, pales in comparison to major healthcare frauds against Medicaid and Medicare totaling over $2 billion, where as an act of mercy, President Donald Trump granted clemency, including pardons and commutations to the offenders.  The most noteworthy of these cases include Philip Esformes (commuted $1.3B fraud) and Salomon Melgen ($42M fraud). These actions wiped out their restitution and forfeiture payments and freed them from long sentences.  To promote respect for the law and fairness in sentencing, we seek mercy in this case, as is granted to far more serious offenders, but unlike those cases, Eric Zhu will pay the financial penalties, thereby promoting respect for the law and general deterrence.

In considering the kinds of sentences available, we submit the Court consider that Eric Zhu's offense conduct was far less serious than other frauds or healthcare fraud offenses.  Eric Zhu did not recruit ineligible senior citizens to submit false and fraudulent paperwork to the MLTC to become approved for unnecessary SADC services – all of his enrolled Medicaid recipients had been pre-approved by the MLTC to receive medically necessary SADC services.  Prime Life was equipped and staffed to provide these SADC services.  The problem was that the

---

[9]   Notably, in *United States v. Stewart*, 59 F,3d 131,135 (2d Cir. 2009), the Second Circuit made it clear that the advisory guidelines provision barring probation for offenses in Zone D, as Eric's is, did not bind District Judges because §5B1.1(b)(2) barring probation was "an advisory not a mandatory provision."

Medicaid recipients wanted money in addition to the option to receive services only when and if they wanted them.  Because Eric Zhu met these demands, he is now paying the price.

### G.  Applicable Guidelines Range;

This factor is discussed at length in Section III above.

### H.  Pertinent Policy Statements in the Guidelines;.

Apart from the guidelines themselves, the Courts are required to evaluate "any pertinent policy statement ... issued by the Sentencing Commission." 18 U.S.C § 3553(a)(5)

In this regard, the Court should take into account the recently enacted Amendment 236 to the guideline, which took effect on November 1, 2025.  This Amendment instructs District Judges to take an individualized approach to sentencing by first calculating the advisory guidelines range as a "starting point" but to then determine an appropriate sentencing relying on the balancing of §3553(a) factors, not the "starting point" of the advisory guideline range. Further, the 2025 advisory guidelines make clear that the Sentencing Commission views a sentence of probation as serving the sentencing goals of punishment and deterrence, as well as rehabilitation, unlike supervised release, which "fulfills rehabilitative ends, distinct from those served by incarceration."

Another policy statement in the Guidelines relied upon by Probation to justify the recommended downward variance for Eric Zhu is the policy statement based on Eric's youthfulness at the time of the offense.  The amendment to the policy statement on §5H1.1 was relied upon in the PSR recommendation in pointing out to the Court that "(c)ertain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships."  The policy statement further opines that "youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation."

### I.  Avoiding Unwarranted Sentencing Disparities

Probation's recommendation of a substantially below-Guidelines sentence for Mr. Zhu is in parity with sentences imposed by the Eastern District of New York and nationally for health care fraud, and similar cases to his own.  As shown below, a sentence substantially below the 42 months' sentence recommended by Probation would be appropriate to avoid unwarranted sentencing disparities based on a series of relatively recent comparison cases. *See* 18 U.S.C. § 3553(a)(6).  We believe a sentence to Probation with a special condition of home incarceration would be sufficient.

1. **Below Guidelines Variances in Healthcare Fraud Cases are the Rule,   Not the Exception in the EDNY and Nationwide**

Judicial disagreement with the sentencing ranges recommended by the advisory guidelines in healthcare fraud cases is reflected by sentencing statistics maintained by the United States Sentencing Commission.

For the Fiscal Year ending 2024, there were 130 Fraud, Theft or Embezzlement sentences imposed in the Eastern District of New York.[10]  Only 28% of these 130 sentences were within the guideline range.  Most of the cases, 72% involved variances or non-5K1.1 downward departures (55%) or §5K1.1 departures (17%).  See: **Exhibit E** -  U.S. Sentencing Comm'n, Statistical Information Packet, Fiscal Year 2024, Eastern District of New York.

Nationwide, for the Fiscal Year ending 2024, 42.8% of sentences for health care fraud were downward variances (with the average reduction being 56.4%), and 35.4% involved §5K1.1 departures.  Thus, nationally, only 18% of health care fraud sentences were within the guideline range.

As for the sentences imposed in the Eastern District of New York for fraud/ theft/embezzlement offenses during the Fiscal Year 2024, slightly more than 70% involved prison only or prison and alternatives.  This statistic was consistent with national statistics, where the average guideline minimum was 50 months, the median loss for health care fraud offenses was $2,532,314, and the average sentence was 27 months, down from 30 months in fiscal year 2020.

The specific offense conduct at issue here was the payment and concealment of cash kickbacks to Seniors to induce them to maintain their enrollment at Prime-Life.  National data for fiscal year 2023 shows that bribery/kickback offenses under §2B4.1 for offenders similar to Zhu had an average sentence of 20 months' imprisonment and a median sentence of 16 months' imprisonment.  In the Eastern District of New York, the average and median sentence was 18 months.  *See*:  *United States v. Shen*, 22 Cr 502 (S-1)(NRM)(ECF Doc. 57).

While this statistic would suggest that the Court's sentence should include a prison term, the unique circumstances in this case, which can best be addressed by a sentence of Probation, militate against such a result and strongly support Zhu being sentenced with the non-insubstantial 30% of offenders who receive a sentence of probation or probation with special conditions.  (Exhibit E).

2. **Some Comparison Cases**

Consistent with the nationwide statistics, prison sentences for defendants similar to Zhu who committed similar offenses have been significantly lower than the recommendation made by Probation in this case.  Where the sentences have been similar to the 42-month sentence

---

[10]  Of these 130 sentences, 95% followed guilty pleas.

recommended by Probation for Eric Zhu, the defendants were far more culpable than Eric is in this case.

For example, in *United States v. Feng Jiang*, 24 Cr. 264, the defendant was an owner, with others, of several pharmacies and an active participant since 2019 in a health care fraud scheme involving the dispensing of medically unnecessary prescription medications and the payment of kickbacks to Medicare recipients to induce them to use the defendant's pharmacies. See, *United States v. Jiang*, 24 CR. 264. ECF Doc. No. 38 (EDNY). Jiang was 37 years old when he invested in and soon began actively participating in the scheme. The restitution amount was $24,411,567.11. During the five years he was involved, Jiang personally received $2 million in salary, and this was the agreed-upon forfeiture amount. Like Eric, Jiang was defined by work and family. Like Eric, Jiang made a concerted effort to satisfy his forfeiture obligation by forfeiting approximately $1.6 million at the time of sentencing, leaving the crippling mandatory restitution amount of $24 million for another day. Like Zhu, Jiang was a zero point offender who engaged in post-offense rehabilitation by proffering with the Government, although he did not enter into a cooperation agreement. Judge Ross sentenced Jiang to 15 months.

In *United States v. Levin*, on the other hand, Judge Cronan sentenced Marianna Levin to 54 months imprisonment for her leadership role in a large-scale scheme that defrauded Medicaid and Medicare by billing for home health aide services that were never performed. Transcript, No. 20 Cr. 681 (E.D.N.Y. Feb. 1, 2023), ECF No. 391. Ms. Levin had a stipulated advisory guidelines range of 87 to 108 months imprisonment and a loss amount of between $25-65 million, but the government claimed the conduct of Ms. Levin's agencies caused more than $100 million in fraudulent billings. *See id.* at 9:16–17, 10:10–14. Eric Zhu's case is clearly distinguishable as the fraudulent billings here totaled $3,169,335, a fraction of the billings in *Levin*.

Further, as shown below, and as supported by the sentencing statistics above, Judges in the Eastern District of New York and other Courts have imposed sentences of probation or time served in a significant number of health care fraud cases for a variety of reasons,

In *United States v. Shen*, 22 CR 502 (NRM), Judge Morrison imposed a sentence of probation on a defendant, like Eric Zhu, who "was paying significant cash to Medicaid recipients to perpetuate a health care fraud scheme" at an SADC provider. Ms. Shen, unlike Eric Zhu, was not the beneficial owner of the SADC, but she exercised the same type of supervisory control over five or more participating Medicaid recipients as Zhu did. Further, she was not a youngster when she decided to engage in the fraudulent kickback scheme, was not raised in a family that demanded she learn about the SADC business, and she did not have the same family responsibilities as Zhu does.

In *United States v. Hua Huang,* 23 CR 234 (ARR), Judge Ross sentenced the defendant, a clerk at two pharmacies, to probation, notwithstanding the defendant having brazenly paid kickbacks and bribes to induce Medicare and Medicaid recipients to have medically unnecessary prescription medications dispensed to them. Although, again, Huang was an employee, not an

owner or beneficial owner, her offense conduct was more egregious than Eric Zhu's because Huang caused Medicare and Medicaid to pay unnecessary costs while the payments to Eric Zhu were for necessary SADC services approved for payment that the Medicaid recipients chose not to avail themselves of through no action on Eric's part.

To avoid unwarranted disparities in sentencing between similarly-situated defendants in this District, as well as dissimilar but far more egregious fraud offenders nationwide who have been pardoned or had their fraud sentences commuted, and to take into account the special circumstances in this case, this Court should impose the sentence recommended by the defense.

### J.        The Need to Provide Restitution to any Victims of the Offense

An additional factor in determining an appropriate sentence is "the need to provide restitution to any victims of the offense."  18 U.S.C. §3553(a)((7).

In its sentencing submission, the Government will no doubt emphasize the harm caused to NY Medicaid by Zhu's fraudulent conduct because such conduct deprives the Medicaid Program of funds it sorely needs. As with the sentencing goal of rehabilitation, the goal of enabling the defendant to make restitution is best served by a non-custodial sentence.  See: *United States v. Menyweather,* 447 F.3d 625, 634 (9th Cir. 2006), abrogation on other grounds recognized in *United States v. Rangel*, 697 F.3d 735 (9th Cir. 2012)("the district court's goal of obtaining restitution for the victims of Defendant's offense . . . is better served by a non-incarcerated and employed defendant.").

In this case, the sole victim is the NY Medicaid Program.  No patients or insurance companies were harmed by Eric Zhu's conduct.  To the contrary, they benefitted  (PSR ¶ 21).[11]

As a sign of his contrition and acceptance of responsibility, Eric Zhu elected not to raise or challenge the restitution amount on the grounds that many legitimate expenses were incurred, and many legitimate services were provided to many of the Medicaid recipients, notwithstanding

---

[11] The Medicaid Recipients who received cash payments were certainly not victims – they were Zhu's co-conspirators.  These poor, elderly, and ailing immigrants received cash payments in addition to being enrolled for SADC services at Prime Life that were always available to them.  No restitution is owed to them.  Nor was the MLTC provider a victim.  The MLTC was authorized to bill the NY Medicaid Program and to earn a profit on the SADC services its subcontractors claimed to provide for the MLTC's recipients.  The MLTC did not lose money from the Prime Life Scheme, it made money, and thus it had no real incentive to investigate a practice that is endemic in the poor, immigrant communities in New York City.  No restitution is owed to them.  (PSR ¶ 8, 11)

the fact that they also received cash payments.  As with the loss amount under the guidelines, restitution is limited to actual loss, but Eric has chosen to pay his debt to society without challenging the restitution amount as was successfully done in *United States v. James,* 151 F.4th 28, at 44-45 (2d Cir. 2025).

As for the restitution owed to NY Medicaid, and his forfeiture obligation under the Plea Agreement, Eric Zhu intends to meet his obligations.  The Second Circuit has held that  "[a] show of lenience to those who exhibit contrition"—e.g., by pleading guilty or paying upfront restitution—"does not carry a corollary that the Judge indulges a policy of penalizing those" who elect not to accept responsibility.  *United States v. Araujo,* 539 F.2d at 292, cited in *United States v. DiMasso,* 117 F.4th 477,  (2d Circ. 2024).   Here, Zhu's efforts early on to responsibly meet his financial obligations, along with the other mitigating §3553(a) factors, make him deserving of leniency because he repeatedly demonstrates by his actions, not his words, that he is truly remorseful and bent on rehabilitation.

## K.  Forfeiture

"[T]he substantive purpose of forfeiture ... is to deprive criminals of the fruits of their illegal acts and deter future crimes." *United States v. McIntosh*, 58 F.4th 606, 610 (2d Cir. 2023) (quotation marks omitted), aff'd, 601 U.S. 330 (2024). "Restitution and forfeiture are authorized by different statutes and serve different purposes – one of remediating a loss, the other of disgorging a gain." *United States v. Torres,* 703 F.3d 194, 196 (2d Cir. 2012*)*; see also *United States v. Bodouva*, 853 F.3d 76, 79 (2d Cir. 2017) (forfeiture " 'is distinct from restitution or other remedial actions, which are intended to return the victim and the perpetrator to the status quo that existed before the violation took place.' ") (quoting U*nited States v. Peters*, 732 F.3d 93, 101 (2d Cir. 2013)).  See also, *United States v. James,* 151 F.4th 28, 47-48 (2d Cir. 2025)(The "basic principle (is) that forfeiture is gain based," citing *United States v. Torres*, 703 F.3d 194, 203 (2d Cir. 2012).

We are mindful that in this case, Eric Zhu managed the billing at Prime Life and controlled the funds received from Medicaid.  After receiving the funds into Prime Life's operating account, Eric possessed them and, among other things, he withdrew them and distributed a significant part of those funds as cash payments to participants in the offense, i.e., the Medicaid recipients.

A strong argument can be made, and the Government will no doubt make it, that all funds Prime Life received from Medicaid through the MLTC provider should be ordered forfeited by Eric Zhu to the Government, in addition to restitution.  It is settled in the Second Circuit that a defendant need not physically or personally possess fraud proceeds in order for those proceeds to be forfeitable; rather, the critical inquiry is control.  Proceeds of a crime "need not be personally or directly in the possession of the defendant . . . in order to be subject to forfeiture," but "must have, at some point, been under the defendant's *control* . . . in order to be considered acquired by

him." *United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012) (emphasis added) (citation and internal quotation marks omitted). Moreover, temporary control is sufficient, and the defendant need not retain the proceeds. *See Tanner*, 942 F.3d 60, 68 (2d Cir. 2019); *United States v. Jergensen*, 797 F. App'x 2, 8 (2d Cir. 2019) (summary order). ; *Rajaratnam v. United States*, 736 F. App'x 279, 284 (2d Cir. 2018) (summary order) (although proceeds of insider trading were subsequently distributed to investors, with the defendant personally retaining only a percentage as management fees, defendant acquired those proceeds for forfeiture purposes where he "had authority over disbursements, and, thus, exercised 'control' over the proceeds 'at some point'")

Nevertheless, a forfeiture is unconstitutionally excessive 'if it is grossly disproportional to the gravity of a defendant's offense.'" *United States v. Viloski*, 814 F.3d 104, 110 (2d Cir. 2016) (quoting *United States v. Bajakaj*ian, 524 U.S. 321, 334 (1998)). The Second Circuit considers five factors to determine if a forfeiture is unconstitutionally excessive: "(1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, . . . (4) the nature of the harm caused by the defendant's conduct," and (5) "whether the forfeiture would deprive the defendant of his livelihood, i.e., his future ability to earn a living." Id. Here, because the restitution amount of $3,169,155 in no way correlates with the gain realized by Eric Zhu, it would be disproportionately punitive to require that Eric Zhu forfeit more than $1,5 Million, when the maximum statutory fine for his offense is only $250,000. In his plea agreement, Eric agreed to forfeit not less than $1,500,000, and we respectfully submit that an amount in excess of $1,500,000 here would be excessive. The Court should prioritize restitution over forfeiture and limit the forfeiture penalty in this case
.

## V.  Conclusion

After considering the circumstances surrounding Eric Zhu's offense, his status as a zero point offender at age 28, the circumstances under which he became involved in the offense conduct, the devastating impact Eric's incarceration in prison will have on his wife and two young children, Eric's immediate acceptance of responsibility and extraordinary post-arrest rehabilitation, and the availability by statute of an alternative to a prison, we submit an appropriately individualized sentence for Eric Zhu would punish his economic crime with severe economic sanctions and by depriving him of his freedom while not punishing his family.  We respectfully submit that a sentence requiring Eric Zhu's incarceration in prison would "work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." Gall at 599 (quoting district court opinion).

Dated:  New York, New York

April 28, 2026                                  Respectfully submitted,

_____
Scott B. Tulman
Attorney for Eric Zhu