ERIC ZHU
63-12 Beach Front Road
Arverne, New York  11692


April 26, 2026

Honorable Diane Gujarati
United States District Court Judge
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Eric Zhu
            25 CR 340 (DG)

Dear Judge Gujarati:

I write this letter with full awareness that I must be held responsible and account for the poor decisions I made in my life, the seriousness of my actions, and the harm I caused to the Medicaid system.  Nothing I say here is intended to excuse or justify my mistakes of the past.  But, at the same time, I want you to understand that I was very young when I became involved in the adult day care business, and I did not understand the broader system I was operating in and that the way it operated was unlawful.

When I first learned about the insurance end of the adult day care business, I understood that the managed long-term care plans act ("MLTC") as intermediaries, receiving fixed monthly payments funded by Medicaid based on the large populations of patients they manage.  The MLTC is interested in managing large patient populations because this increases its value.  The MLTCs are routinely sold and absorbed by others, with the owners making exorbitant amounts of money.  These are billionaires – not millionaires.  While adult day care operators like I was have incentives to retain members, the incentives at the MLTC level operate on an entirely different scale, involving billions of dollars.  SADC providers who fail to provide new enrollments or maintain enrollments can be terminated as sub-contractors and will be out of business.

Prime Life Adult Day Care LLC dealt with only one MLTC, and it was that MLTC, Centers Plan for Healthy Living, that enrolled patients and evaluated them through a process called CFEEC (CONFLICT FREE EVAULATION and ENROLLMENT CENTER)  Once screened and approved by the MLTC, the patient can be followed by assessments conducted by nurses working for managed long-term care plans. These determinations, including the determination whether adult care services were necessary were decisions I had nothing to do with.  Once that determination is made, there is a pressure placed on the adult day care to increase and then maintain its enrollments, because of the fear of being terminated as a provider.

1

Apart from it being tacitly condoned in the healthcare industry, it was very easy for me to rationalize what I was doing to excuse my illegal conduct.  Many of the individuals I worked with were elderly immigrants with zero English proficiency, living on fixed incomes that did not come close to covering the cost of housing in New York City. They relied entirely on their immediate community for communication, for navigating basic services, and for day-to-day survival. Many had spent their lives working low paying or informal jobs, leaving them with little to no retirement income beyond minimal Social Security or SSI. For them, housing was not a policy issue, it was a constant fear. I saw people worried about how they would pay rent, where they would go if they could not, and how they would survive in a system they could not even fully understand.

This was not unfamiliar to me. I grew up in a two-bedroom, one bathroom, 650-square-foot apartment that was divided into multiple rooms to fit ten  people—my parents, siblings, grandparents, and extended relatives all under one roof. That level of overcrowding was my normal. Seeing similar conditions among the elderly people I worked with did not stand out to me as unusual—it felt like a continuation of what I had always known. – and I felt terrible about it.  Overcrowded tenement-style living is often spoken about as something from the past— something that belonged to another era. But for many of the elderly immigrants I worked with, it is a present reality. They are living in cramped, divided apartments, sharing limited space with multiple family members, trying to survive on fixed incomes that do not meet the cost of housing. For them, this is not the history of immigrant struggles in America —it is daily life. That reality shaped how I saw what I was doing at the time. The patients believed the incentives came from the government, and I believed I was helping people maintain some level of stability in a situation where they had very little control.

Despite this, I fully acknowledge that I should have exercised better judgment. I should have stepped back and questioned what I was involved in. I did not, and I take responsibility for that failure.

This process has forced me to look inward in a way I had not before. It is one thing to understand what happens around you, but something else to confront your own decisions within it. As it is often said, "knowing others is intelligence, knowing yourself is true wisdom." I have come to see clearly where I failed. At the time, I moved with what felt like the natural flow around me. Looking back, I see I failed to step outside of it and question where it was leading. Actions carry consequences beyond the moment, and that responsibility does not end with intention—it extends to outcome.  Failing to question an environment is itself a choice, and one I will not repeat.

I also ask the Court to consider the practical impact of incarceration in my case. Incarceration comes at a significant cost to taxpayers when I have already cost the taxpayers so much money.  If an important goal here is to protect taxpayers and have me make restitution, then I beg you to give me the opportunity to right my wrong instead of spending those resources to incarcerate me.   I am capable of working. I am capable of contributing. I am capable of making restitution. Incarceration would remove that ability entirely while adding further cost to the same taxpayers I am expected to repay, making my imprisonment a zero-sum game.

I am facing a substantial financial penalty—$3.1 million in restitution which I express ACTUAL plans to repay and not less than $1.5 million in forfeiture.  I have tried, in my own way, to atone for my wrongdoing. This felony conviction will follow me for the rest of my life. These are real punishments, but I am committed to meeting the challenges and rebuilding my life in a lawful and responsible way. I am a husband, and a father not just a son.  I now understand the responsibility that comes with my roles as a husband and a father to my two children requires that I never again put myself in a position where I am violating the law, regardless of who asks me to do it.

I respectfully ask the Court that when it determines an appropriate sentence in this case that it consider the pressures placed on me at a young age to become involved with and learn how to operate in a system created by others that seemed to condone, not condemn my conduct in paying cash kickbacks to increase and maintain enrollments.  Also, please take into consideration my immediate acceptance of responsibility for my past mistakes, my efforts to get out of the adult day care business, my lack of a prior criminal history, and my commitment to my family and my making restitution.

Sincerely yours,


Eric Zhu

3