

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

TJT/JRS:PJC/LS
F. #2022R00297

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 4, 2026

By ECF

Honorable Diane Gujarati
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re: United States v. Eric Zhu
> Criminal Docket No. 25-340 (DG)

Dear Judge Gujarati:

As an operator of a social adult day care ("SADC"), the defendant Eric Zhu defrauded Medicaid of more than $3.1 million through the payment of cash kickbacks and bribes to Medicaid recipients and billing for services that were not provided as represented. Zhu turned a federal health care program designed to keep seniors out of nursing homes into a cash grab. On May 19, 2026, the Court is scheduled to sentence Zhu following his guilty plea to conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349. The government respectfully submits this letter in advance of the sentencing and in response to the defendant's sentencing submission. See ECF No. 26 ("Def. Mem.").

In view of the seriousness of the offense, the defendant's leadership role, the harm caused to Medicaid, and the significant need for deterrence, the government respectfully submits that a sentence within the United States Sentencing Guidelines ("U.S.S.G" or "Guidelines") range of 57 to 71 months is sufficient, but not greater than necessary, to achieve the goals of sentencing. The government also respectfully requests that the Court order Zhu to pay restitution in the amount of $3,169,335 and enter a forfeiture money judgment in the amount of no less than $1,500,000, consistent with the terms of the plea agreement.

I. Background and Procedural History

A. Defendant's History and Characteristics

From 2020 to 2025, Zhu was the beneficial owner and managing employee of Prime Life Adult Day Care LLC ("Prime Life"), a SADC in Brooklyn. See Pre-Sentence Investigation Report ("PSR") ¶ 13. Zhu was involved with Prime Life from at least April 2020, when he signed

a contract on behalf of the SADC with a New York Medicaid managed long-term care ("MLTC") organization to provide SADC services. Id. ¶ 16.[1]

SADCs are intended to provide seniors with socialization, supervision, assistance with personal care, and nutrition services in a protective setting. Id. ¶ 9. In order to qualify for SADC services, a Medicaid recipient must first have approval to receive home health services. Id. ¶ 11. SADC services are typically approved for a given number of days per week. To guard against fraud, MLTCs require SADCs to track attendance, often in the form of handwritten attendance sheets. Id. ¶ 10.

In addition to his role with Prime Life, Zhu was the sole owner of Canal Pharmacy since 2020. Id. ¶ 61. As the PSR indicates, Zhu is also the owner of several other businesses in the health care field including a medical supply business (Parnas Medical Supplies, Inc.). Id. ¶¶ 61-64.

B.      The Government's Investigation

Between May and August 2025, a cooperating source ("CS") audio and video recorded visits to Prime Life that showed the operation of Zhu's fraud scheme. In May 2025, the CS accompanied two Prime Life members, a husband and wife, to meet Zhu at Prime Life while, unbeknownst to them, they were driven by an NYPD Detective posing as a taxi driver. The driver asked the members how they liked Prime Life, to which they responded, "Who cares about the place, we just go there to get the money." The husband then explained that they went to Prime Life once per month to sign a months' worth of paperwork "in one shot."

When the trio arrived at Prime Life, they were escorted to the basement to meet Zhu in his office. During the meeting, Zhu counted out $1,500 in cash and provided it to the couple as a kickback. When the CS asked Zhu what he would pay if the CS were to bring his/her parents to Prime Life, Zhu offered to pay $250 per month for a member who was enrolled for two days of SADC services per week. Noting that this was less than the CS had just witnessed the couple receive, he/she pressed Zhu, who explained in response that the couple were a "special case" because they had referred other Medicaid patients to Prime Life. Zhu then offered to pay the CS $300 per month if the member whom the CS referred would also switch to an affiliated home health care company.

In August 2025, the CS returned to Prime Life with two prospective SADC members. The CS asked Zhu how much Zhu would pay if the members were approved for three days of SADC services per week, to which he explained, "same as him, five," indicating to another member who had just been paid and referring to $500 per month. Zhu said, "For two days, I give three," meaning $300 per month. The CS asked if the members had to attend on their approved days, and Zhu replied, "They should come. We encourage people to come, encourage. But you are a smart [person]."

---

[1]      Although Zhu managed Prime Life, much of its official paperwork was in the name of his family members, including its primary bank account, which was in the name of his grandmother residing in China.

A Prime Life employee also provided law enforcement with text messages between that employee and Zhu. In those text messages, Zhu instructed the employee to distribute envelopes containing cash payments and to get Prime Life members to sign their attendance sheets: "Call them accordingly and get them to sign and if someone says anything tell them to call and that you don't know anything." The employee reported that Prime Life's members do not generally attend the SADC on their approved days. Zhu was apparently aware that people may record him. In August, he texted the employee and instructed, "Make sure when they [the members] come down [to the basement], their phone is in their pants pocket."

On August 27, 2025, a search warrant was executed at Prime Life. Id. ¶ 20. The premises search recovered evidence consistent with a scheme to pay kickbacks and bribes to beneficiaries in connection with billing Medicaid for SADC services. For example, law enforcement recovered envelopes listing the names of SADC members, the number of days of SADC services for which they were approved, and an amount that they would be paid in kickbacks. Law enforcement also recovered paper bags stamped with the insignia of Canal Pharmacy and containing prescription drugs, cash, and items such as toothpaste, consistent with the payment of kickbacks in connection with the dispensing of pharmaceuticals at Zhu's pharmacy.



Photographs from the premises search at Prime Life also documented a spartan facility, consisting of rows of tables on the first floor and a mostly empty basement that is at odds with a functioning, bona fide SADC.

Medicaid claims data show that, between 2020 and 2025, Prime Life received approximately $3.1 million in reimbursements for SADC services that were induced by bribes and kickbacks. Those funds were deposited into a bank account held in the name of Zhu's relative, but to which Zhu had access and control.

3

C.      Procedural History

On August 26, 2025, Zhu was arrested, while boarding an international flight, on a complaint charging with the payment of illegal kickbacks in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B).  Id. ¶ 19.

On November 18, 2025, Zhu waived indictment and entered a guilty plea before the Honorable Marcia M. Henry, United States Magistrate Judge, to a single-count information charging him with conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349.  On December 16, 2025, the Court accepted Zhu's guilty plea.  ECF No. 17.

II.      Zhu's Guidelines Range

The government agrees with the Guidelines calculation in the PSR, which results in a total adjusted offense level of 25.  See PSR ¶¶ 25-34.  The base offense for a conviction pursuant to 18 U.S.C. § 1349 is six, and 16 levels are added for a total loss of greater than $1,500,000 and less and $3,500,000.  See U.S.S.G. §§ 2X1.1(a), 2B1.1(a)(2), 2B1.1(b)(1)(I).  Four levels are added because Zhu was a leader and/or organizer of the fraud scheme.  See U.S.S.G. § 3B1.1(a).  Three levels are subtracted for acceptance of responsibility.  See U.S.S.G. § 3E1.1(a), (b).  With a total adjusted offense level of 25, and Criminal History Category I, the Guidelines range of imprisonment is 57 to 71 months.  PSR ¶ 73.

III.     A Sentence Within the Guidelines is Appropriate

A.      Legal Standard

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light of other statutory concerns.  543 U.S. 220, 245 (2005); see 18 U.S.C. § 3553(a).  Subsequent to Booker, the Second Circuit has held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)."  United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005).  Although the Second Circuit declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, it cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum."  Id. at 113.

Subsequently, in Gall v. United States, 552 U.S. 38 (2007), the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall, 552 U.S. at 49 (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [the Court] may not presume that the Guidelines range is reasonable.  [The Court] must make an individualized assessment based on the facts presented."  Id. at 50 (citation and footnote omitted).

4

Title 18, United States Code, Section 3553(a) provides numerous factors that the Court must consider in sentencing the defendant. These factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to (a) reflect the seriousness of the offense, to promote respect for the law and to provide just punishment, (b) afford adequate deterrence to criminal conduct, (c) protect the public from further crimes of the defendant, and (d) provide the defendant with appropriate education or vocational training; (3) the kinds of sentences available; (4) the Guidelines range; (5) pertinent policy statements of the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution.

B.      Discussion

The government respectfully requests that the Court impose a sentence within the Guidelines range of 57 to 71 months' imprisonment because such a sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing. See 18 U.S.C. § 3553(a).

1.      The Nature and Circumstances of the Offense

The nature and circumstances of the offense warrant a significant sentence. For more than five years, Zhu led a scheme designed to defraud Medicaid of more than $3.1 million. During these years, Prime Life billed Medicaid for services that were induced by the payment of illegal kickbacks and bribes to patients, who generally did not attend the SADC on their approved days. The brazen nature of the scheme is evident from the CS recordings. During the CS's first meeting with Zhu—whom the CS had never met previously—Zhu immediately offered to pay cash to Medicaid recipients to induce them to sign up for SADC services at Prime Life. This recorded interaction makes clear that the operation of Prime Life was strictly criminal. Zhu, who is a savvy and rational operator, undoubtedly calculated that benefits of defrauding Medicaid were not outweighed by the risks. On a monthly basis over a period of years, he determined that it was appropriate to pay patients cash rather than operate legitimately. Such a long term pattern of fraud on the government merits commensurate punishment.

2.      The History and Characteristics of the Defendant

The combined picture from the PSR and Zhu's own sentencing submission is that of a sophisticated entrepreneur who has found success in business, albeit tainted by fraud.[2] Although the offense of conviction involves the healthcare fraud conspiracy at Prime Life, a fair consideration of the characteristics of the defendant shows that the fraud scheme extends to the defendant's other businesses. As noted above, during the search of Prime Life, law enforcement recovered evidence of kickbacks to customers of Canal Pharmacy, which Zhu has owned since 2020. Id. ¶ 61. For their part, the CS recordings evidence Zhu's offer to pay Medicaid recipients an incentive if they enrolled with an affiliated home health care company, suggesting that the scheme extended to homecare. Although it falls outside of the offense conduct to which the defendant pled guilty, the evidence bespeaks of a broader course of conduct involving SADC, pharmacy, and home health.

---

[2]      Zhu was raised in a stable home, attended high school in the United States, and completed some college. PSR ¶¶ 58-59. He is married with two children. Id. ¶ 45.

What's more, as the defendant's plea allocution makes clear, the fraud scheme is inextricably linked with a money laundering operation that supported the payment of kickbacks. See ECF No. 16 at 35:13-16. This is because health care entities that primarily bill Medicaid—such as Prime Life—do not generate cash but require a steady supply of cash to pay kickbacks to SADC patients monthly. Since such kickback payments are unlawful, the cash must be generated surreptitiously. The investigation has shown that Zhu engaged in unlawful financial transactions to generate the necessary cash to pay kickbacks and to conceal the kickback scheme.

For a man of just 28 years of age, Zhu has amassed considerable wealth from his ownership of several businesses that appear to have been involved in the kickback scheme. For example, Zhu is the owner of a building in Brooklyn that houses Prime Life and a building in Manhattan that houses another SADC. Other than Prime Life, Zhu's businesses include a medical supply business (Parnas Medical Supplies, Inc.) and the pharmacy (Canal Pharmacy, Inc.) that operated through kickbacks. PSR ¶¶ 64-66. Despite the modest roots that the defendant emphasizes to the Court at length in his sentencing memorandum, Zhu now owns a beach-front home in the Rockaways and has a substantial net worth. Id. ¶¶ 61-66.

3. A Guidelines Sentence Appropriately Reflects the Seriousness of the Offense, Promotes Respect for the Law, and Provides Just Punishment

A fair consideration of Section 3553(a) factors also requires a Guidelines sentence. Health care fraud and the payment of health care kickbacks are unquestionably serious. Annual losses tied to health care fraud are estimated to be in the tens of billions of dollars,[3] and associated money laundering enables and conceals the fraud. Kickback schemes in SADCs and pharmacies, like the defendant's scheme, are endemic in this District. Such schemes drive legitimate actors from the system, drive up costs for taxpayers, and degrade patient care.

A Guidelines sentence reflects the seriousness of the crime, promotes respect for the law, and provides just punishment. To allow a blatant fraud and kickback scheme like the one Zhu has been convicted of to be punished through only monetary penalties in the manner Zhu urges (Def. Mem. at 1) would grossly underestimate the seriousness of the offense and send a message to SADCs, pharmacies, clinics, and medical supply businesses in the District that health care fraud may be worth committing because even those defendants who are criminally prosecuted are unlikely to face serious punishment in the form of a custodial sentence. Furthermore, to the extent Zhu can satisfy significant aspects of the financial penalties associated with his conviction, a noncustodial sentence would send the wrong message that this is a crime that an affluent defendant can pay to make go away.

Courts and Congress have long indicated that white-collar crimes, like Zhu's, require meaningful punishment to outweigh the substantial incentives that exist to engage in such potentially lucrative conduct. See United States v. Cavera, 550 F.3d 180, 196 (2d Cir. 2008) (en banc) ("Where the profits to be made from violating a law are higher, the penalty needs to be

---

[3] https://www.nhcaa.org/tools-insights/about-health-care-fraud/the-challenge-of-health-care-fraud/#:~:text=The%20National%20Health%20Care%20Anti-Fraud%20Association %20%28NHCAA%29%20estimates,the%20tens%20of%20billions%20of%20dollars%20each% 20year (last accessed May 1, 2026).

corresponding higher to achieve the same amount of deterrence."). Zhu's conduct warrants serious punishment in the form of a Guidelines sentence.

### 4. A Substantial Sentence Affords Adequate Deterrence

Because kickback schemes in SADCs and pharmacies are a known problem in this District, a Guidelines sentence is equally necessary to deter other market participants. As the Second Circuit has noted, significant sentences are particularly appropriate in white-collar criminal cases to promote general deterrence. See, e.g., United States v. Goffer, 721 F.3d 113, 132 (2d Cir. 2013) (noting that some feel that white-collar crimes are a "game worth playing"). "'Persons who commit white-collar crimes like [d]efendants' are capable of calculating the costs and benefits of their illegal activities relative to the severity of punishments that may be imposed. A serious sentence is required to discourage such crimes.'" United States v. Vrancea, 136 F. Supp. 3d 378, 392 (E.D.N.Y. 2015) (quoting United States v. Stein, No. 09-CR-377, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010) (Weinstein, J.)); see also United States v. Marsh, No. 10-CR-480 (JBW), 2011 WL 5325410, at *1 (E.D.N.Y. Oct. 26, 2011) ("[I]ndividuals who engage in financial fraud can, at least in theory, be deterred by a substantial threat of penalties. Their actions are calculated. They choose to engage in white collar crime because they believe that the potential for significant financial benefits outweighs the risk that they will be punished."); see also S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("The second purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white collar crime and government corruption. Major white collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.").

The government's investigation of several related SADC fraud schemes in this District has shown that news of the prosecution of individuals in this space travels fast within the community of SADC owners, operators, and employees. As noted above, a sentence with only monetary component, such as the one Zhu urges this Court to impose, would send a message within the District that health care fraud may be worth committing because even the small subset of fraudsters who are selected for criminal prosecution are unlikely to face a custodial sentence. A Guidelines sentence is necessary to show other fraudsters and would-be fraudsters that fraud in this sector comes with substantial penalties and are not worth the risk.

### 5. A Guidelines Sentence is Necessary to Protect the Public

Health care fraud is also not a victimless crime. Schemes like Zhu's deplete the financial resources needed to pay for legitimate health care services that the elderly and indigent desperately need. Every dollar that went to Zhu and his family members, or as kickbacks to SADC members, could have instead paid for legitimate treatments, medications, and services. The MLTC contract that Zhu held could have gone to a legitimate SADC that could have kept seniors from deteriorating and needing long-term nursing care.

SADCs that submit fraudulent claims and attract customers through kickbacks also corrupt the marketplace and drive out legitimate actors and aspiring business owners, making real services harder to obtain. As Zhu appears to acknowledge, those who cannot compete with fraudsters turn to fraud themselves, thus perpetuating the cycle. A Guidelines sentence would protect the marketplace by deterring others from engaging in similar conduct and help break the cycle.

6.      <u>Avoiding Unwarranted Sentencing Disparities</u>

A Guidelines sentence of 57 to 71 months' imprisonment is also necessary to avoid unwarranted sentencing disparities among similarly situated defendants nationally. Recent health care fraud sentences in the District demonstrate that a significant sentence is appropriate.

For example, in <u>United States v. Jiang</u>, which Zhu cites, the Court sentenced to 15 months' imprisonment defendant Feng Jiang, who was convicted of money laundering conspiracy in connection with a scheme to defraud Medicare of $24 million through the payment of illegal kickbacks and bribes. <u>See</u> Judgment, <u>United States v. Jiang</u>, No. 24-CR-264 (ARR), ECF No. 46. Notably, however, this defendant conducted himself more as a silent partner than an active operator and did not receive a leadership enhancement. Zhu omits that this Court sentenced Jiang's co-conspirator, Taesung Kim, to 63 months' imprisonment for his role in the scheme. <u>See</u> Judgment, <u>United States v. Kim</u>, No. 23-CR-191 (DG), ECF No. 126.

The defendant's citation to two other recent cases in this District in support of the claim that he should receive a probationary sentence is inapposite. <u>See</u> Def. Mem. at 26. In <u>United States v. Shen</u>, the defendant who received a probationary sentence for her role in the healthcare fraud and kickback scheme at another SADC was a low-level clerk who stands far apart from a leader and manager such as Zhu. <u>See</u> <u>United States v. Shen</u>, No. 22-CR-502 (NRM). Similarly, in <u>United States v. Hua Huang</u>, the defendant was a clerk at two pharmacies, rather than an owner or operator. <u>See</u> <u>United States v. Hua Huang</u>, No. 23-CR-234 (ARR). If anything, these cases illustrate why Zhu, a beneficial owner and manager, should not benefit from a similar sentence.

Federal sentencing statistics also show why a custodial sentence is appropriate. For the fiscal years 2021 through 2025, of the approximately 179 defendants whose Guidelines were based on a Total Offense Level of 25, a Criminal History Category I, and whose primary Guideline was Section 2B1.1, the average length of imprisonment was 40 and the median length of imprisonment was 42 months.[4] While the mean and median sentences imposed are slightly below the government's requested Guidelines range of 57 to 71 months' imprisonment, the averages are nowhere near the probationary term that the defendant urges this Court to impose.

IV.     <u>Restitution and Forfeiture</u>

Zhu has agreed to pay restitution, which is mandatory in this case. <u>See</u> Plea Agreement ¶ 1(e).[5] In <u>United States v. Zangari</u>, 677 F.3d 86, 93 (2d Cir. 2012), the Second Circuit held that restitution must be measured according to the victim's actual loss, not the defendant's gain. Moreover, in calculating restitution, "these losses need not be mathematically precise," and "[a] reasonable approximation will suffice, especially in cases in which an exact dollar amount is inherently incalculable." <u>United States v. Rivernider</u>, 828 F.3d 91, 115 (2d Cir. 2016) (internal quotation marks omitted). The government respectfully submits that the Court should order Zhu

---

[4]      U.S. Sentencing Commission, Judiciary Sentencing Information (JSIN), <u>available at</u> https://jsin.ussc.gov/analytics/saw.dll?Dashboard. (last visited May 1, 2026).

[5]      Although Zhu's plea agreement references a restitution order to be filed with the Court, the government does not intend to file a separate restitution order, and restitution can be included in the judgment and commitment.

to pay restitution in the amount of $3,169,335 to Medicaid, which represents the amount of money Medicaid paid for SADC services at Prime Life that were not provided and/or were induced by the payment of illegal kickbacks and bribes. PSR ¶ 82. Zhu agreed to this restitution figure in his plea agreement.

The government submits that Court should also impose a forfeiture money judgment in the amount of no less than $1,500,000, consistent with Zhu's plea agreement. Id. ¶ 84.

V.      Conclusion

In sum, based on a balancing of the Section 3553(a) factors, the Court should impose a Guidelines sentence of 57 to 71 months' imprisonment and order Zhu to pay restitution and forfeiture.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

LORINDA LARYEA
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

By:     */s/Patrick J. Campbell*
Patrick J. Campbell
Leonid Sandlar
Trial Attorneys, Fraud Section
Criminal Division
U.S. Department of Justice
(202) 262-7067

cc:   Clerk of the Court (DG) (by ECF)
Counsel of record (by ECF)
Nicole Gervase, U.S. Probation Officer (by email)